Filed 6/27/23  In re P.D. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.D. et al., Persons Coming Under the Juvenile Court Law. | B316306 (Los Angeles County Super. Ct. No. 21LJJP00348ABCDEFG) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>REBECCA N.,<br><br>    Defendant and Appellant. | |

APPEAL from findings and an order of the Superior Court of Los Angeles County.  Susan Ser, Judge.  Dismissed in part and affirmed in part.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Bryan Mercke, Deputy County Counsel, for Plaintiff and Respondent.

_____

Rebecca N. (mother) appeals from the juvenile court's jurisdictional findings (Welf. & Inst. Code, § 300)[1] and dispositional order[2] regarding seven of her children. She contends that the jurisdictional findings are not supported by sufficient evidence.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     In the conclusion section of mother's opening brief, she seeks reversal of the juvenile court's dispositional orders. Mother does not advance any claim of error regarding the dispositional orders in the discussion portion of her brief. To the extent mother purports to assert any substantive challenge the validity of the dispositional order, we deem it forfeited as perfunctory, and assume that her request is based on her hoped-for reversal of the jurisdictional findings. (*In re Athena P.* (2002) 103 Cal.App.4th 617, 624 ["Failure to appeal from an appealable dispositional order waives any substantive challenge to the jurisdictional findings"]; Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).)

2

We dismiss that portion of mother's appeal concerning her six younger children. As to the oldest of the seven children, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*The family*

This family consists of mother, Damian N. (father),[3] and their seven minor children: Paige D. (Jaxson, born Dec. 2006),[4] Zoe N. (Zoe, born July 2008), Mia N. (Mia, born Jan. 2010), Linus N. (Linus, born Dec. 2010), Willow N. (Willow, born Aug. 2012), Harrison N. (Harrison, born July 2016), and Xander N. (Xander, born July 2018).[5] The family lived together until August 2020, when mother fled the home.

*Referral and investigation*

In June 2021, the Los Angeles County Department of Children and Family Services (DCFS) received a referral[6] alleging that mother had left the family home, leaving father to care for all of the children, some of whom have special needs. The reporting party also stated Zoe had attempted suicide in

---

[3] Father is not a party to this appeal.

[4] Like the parties and the juvenile court, we refer to this child as Jaxon.

[5] The children also have an adult half-sibling, Kayla D.

[6] This was not the family's first referral to DCFS. There was a referral in 2017 and three referrals in August 2020. One referral concerned Kayla's attempted suicide and hospitalization caused in part by father's alleged emotional abuse. Another referral concerned domestic violence; this domestic violence caused mother to leave the home.

February 2021, and Zoe disclosed that father called her demeaning names, such as "whore" and "slut." The reporting party further stated that Mia had indicated that Zoe would probably attempt to commit suicide again based on father's insults.

Interview with father

A DCFS social worker spoke with father about the concerns. He reported that Zoe is on new medication, and he was working on getting her a new therapist. He denied calling Zoe any derogatory names. Father admitted to using marijuana.

Interview with mentor

The social worker next spoke to a mentor for some of the children at Antelope Valley Partnership for Health (AVPH). A case manager with AVPH reported that Mia disclosed that father yells at Zoe and calls her derogatory names. Mia heard Zoe tell father "'[y]ou make me want to kill myself.'" (Italics omitted.) The case manager also reported that Mia had lost a lot of weight. Father withdrew the children from the services that AVPH provided after the report was made to DCFS.

Interview with the children

On June 22, 2021, the social worker spoke with the children. Zoe told the social worker that father's screaming gives her "'manic attacks,'" and that she suffers from disassociative and bipolar disorder. While Zoe admitted to cutting herself in the past, she denied having current suicidal or self-harming thoughts.

Jaxson reported that the home is extremely chaotic, partly because Harrison, who has autism, urinates and defectes throughout the home and father constantly yells. Jaxson really wanted to see mother, but understood why she had left the home.

4

He reported that he felt very stressed and overwhelmed in the home.

Willow and Linus confirmed that father frequently yells; Linus felt unsafe and scared.

Mia also reported that father yelled, making her feel scared and unsafe. She reported that she may not have eaten anything the day before, and she doubted that father noticed. She had lost a lot of weight. She could not sleep; she lost her appetite; and she felt sad. She also stated that father smoked marijuana multiple times per day and cultivated it in the garage.

Interview with mother

On June 30, 2021, a DCFS social worker interviewed mother.[7] Mother was concerned about the children, however she believed that she could not do anything about it. Mother was aware of father's marijuana use, and believed marijuana made father unstable. She stated that it was no longer safe for her to be in the home, reporting that father is "'verbally abusive.'" According to mother, father threatened to shoot her and her then unborn child.

Mother said that her home was not large enough for the children to move in with her. She claimed that she had tried to find a shelter for her and the children but was unable to locate one.

Regarding the children, mother stated that Jaxson has anxiety, and she was aware of Zoe's self-harming behavior,

---

[7]    About one week earlier, mother had given birth to an infant not part of this case. It seems that between the time mother moved out of the family home and June 2021, mother had entered into a new relationship with another man.

health issues, nightmares, instability, and need of proper medication. She was aware that Linus was frequently blamed for things and had a lot of pressure on him in the home. Mia is on the autism spectrum, and mother was aware of Mia's weight loss issues.

*Section 300 petition*

On July 6, 2021, DCFS filed a section 300 petition under subdivisions (b)(1), (c), and (j) on behalf of the children, alleging medical neglect and emotional abuse by both parents of Zoe and Mia, placing all seven children at risk of serious physical harm.

*Detention hearing*

At the July 16, 2021, detention hearing, the juvenile court ordered Jaxson to remain in his parents' care (in father's home) under DCFS supervision. Zoe, Mia, Linus, Willow, Harrison, and Xander were detained from the parents and placed in shelter care.

*First amended petition*

A first amended petition was filed August 23, 2021, adding new allegations under subdivisions (a) and (b) regarding the parents' domestic violence, father's marijuana abuse and cultivation, and mother's failure to protect.

*Investigative reports*

A dependency investigator prepared seven reports for the jurisdiction/disposition hearing.

<u>Zoe</u>

Zoe stated that father made her read the detention report out loud, told her the case was her fault, and that she would be raped in foster care. She also reported that father would scream and threaten mother. Zoe felt scared when mother and father

fought as father would throw things and threatened to kill mother and her unborn child.

Zoe's mental health had deteriorated as well, as she reported overdosing on sleeping pills and cutting herself as a result of father's behavior. Zoe also reported that Kayla also had attempted suicide because of father's behavior. In September 2021, Zoe took several prescription medication pills, cut herself with a razor, and was transported to the hospital. Zoe was then moved to the foster home where Harrison and Xander had been placed.

Mia

Mia also disclosed concerns about living with father. She reported that father threatened to tie Linus to a chair in the summer and only give him a wet towel to drink. Mia barely slept and barely ate while living with father as father did not prepare meals and the children had to cook for themselves. Mia also felt overwhelmed and scared because of father's screaming. She admitted that she had snuck knives into her room and contemplated hurting herself due to the environment in father's home.

Linus

Linus did not feel safe with father because of his anger issues. Father called Linus ungrateful and cursed at him. While Linus denied being physically hit by father, father did threaten him and on one occasion intentionally stepped on his hand. On one occasion, father threatened to tie him to a tree and only give him a wet rag to drink.

Linus also reported that Zoe and Kayla tried to commit suicide because of father's screaming.

Willow

Willow confirmed that father had threatened mother. His frequent yelling made Willow cry. According to Willow, Zoe cut herself and went to the hospital because of father's actions.

Jaxson

Jaxson reported that father's outbursts were caused by the stress of caring for so many children. Zoe had told Jaxson about her self-harming behaviors, and when Jaxson told his parents about it, they told Zoe to speak to her therapist.

Kayla

Kayla and Jaxson primarily made dinner for the other children. Almost every day, she would find Harrison and Xander naked, cold, or thirsty. Kayla and her siblings would care for Harrison and Xander and put them to bed, as father did not help with that task. Kayla struggled to put Harrison and Xander to bed as the young children wanted to see father, but father was often busy tending to his marijuana plants instead.

Father

Father stated that Zoe sees a doctor, takes medication, and gave no indication of mental health issues before her suicide attempt in February 2021. Father denied calling Zoe derogatory names, and stated he curses at the children's behavior, not at them. Father denied screaming at any of the children or calling them names. Father did not believe Mia was underweight, and while he acknowledged the children at times cook for themselves, he stated he also cooks for them.

Mother

Mother stated that she has a long history of domestic violence with father. He called mother demeaning names and threatened her.

When Zoe started having mental health issues, mother was not in the home, and she called father to try to get Zoe into counseling. Mother claimed that after Zoe tried to kill herself, all father had to do was follow through on Zoe's medication. Zoe would call mother when she was feeling distressed, and during the calls mother heard father screaming at Zoe in the background.

Mother claimed that she visited the children when father was not around. Mother stated that she tried to talk to the children daily to ensure their needs were met, and would buy food for them when needed.

Mother denied that Mia had lost weight, and stated she had always been a picky eater. She acknowledged that Mia's current mental health issues were related to father's treatment of Mia. Mia told mother about father screaming at her, and mother heard father's screaming on the phone with Mia as well.

Prior to the jurisdictional and disposition hearing, mother had enrolled in a parenting course and a domestic violence course, and she started having unmonitored visits with the children. She was working on getting a home with enough space for all of the children.

Mother shared a video that she claimed that Kayla had sent her. In the video, Linus stated to the camera, "'my dad . . . threatened to break all my teeth.'" In the same video, Mia stated father threatened to stab and cut both Linus and herself.

Father's marijuana use

Zoe, Mia, Linus, Willow, Jaxson, and mother all reported that father uses marijuana and grows it in the home. Zoe stated that one time, Harrison gained access to the marijuana in father's room and almost ate some. She also said he smokes

9

before driving the children. On one occasion, father gave Zoe a marijuana edible, and mother was aware of this and disapproved. Zoe disclosed that Jaxson tried marijuana as well.

Mia relayed that Harrison and Xander got into the marijuana on one occasion. According to Willow, these boys got into a poison kept in the hallway that is used to grow marijuana.

Father admitted to using marijuana at night, and for medical reasons. He keeps his marijuana plants and paraphernalia in locked areas. The dependency investigator observed marijuana plants growing both in the garage and in the backyard of the home during a home inspection. Father denied using pesticides on the plants.

*Jurisdiction/disposition hearing*

On October 18, 2021, the juvenile court sustained the section 300, subdivisions (b)(1) and (j), counts regarding domestic violence, medical neglect of Zoe and Mia, father's marijuana abuse and cultivation, and mother's failure to protect.[8] The juvenile court reasoned that mother failed to protect the children from the domestic violence because the words that were used in front of the children had a detrimental effect on them. Moreover, while mother ensured her safety by moving out, "she left these children with [father], knowing all the issues they had before she left the home," and failed to ensure the "children's safety." While the juvenile court acknowledged that mother tried to make preparations to take the children with her, after mother left, she decided to start "a new relationship with a new boyfriend" that

---

[8] A second domestic violence count (§ 300, subd. (a)) and the emotional abuse count (§ 300, subd. (c)) were dismissed.

"interfere[ed] with her ability to take her other children into her home."

The children were declared dependents of the juvenile court. Jaxson remained released to both parents, and the younger children were detained from both parents.

*Appeal*

Mother filed a timely appeal.

*Postjudgment events*

While this appeal was pending, the six younger children (Zoe, Mia, Linus, Willow, Harrison, and Xander) were returned to mother's custody. On September 28, 2022, the juvenile court terminated jurisdiction with a family law order for mother to have sole legal and physical custody of Zoe, Mia, Linus, and Willow. On February 3 and 10, 2023, the juvenile court terminated jurisdiction over Harrison and Xander, respectively, with a family law order granting mother sole legal and physical custody of those children.[9]

**DISCUSSION**

I. *Justiciability and mootness*

DCFS argues that mother's appeal should be dismissed as to the six younger children because the juvenile court terminated jurisdiction over them and granted mother sole legal and physical custody in a family law order. We agree.

"[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error." (*In re N.S.* (2016) 245 Cal.App.4th 53, 60.) Here, no effective relief can be granted

---

[9]     We hereby grant respondent's motion for judicial notice filed February 14, 2023.

11

to mother.  Dependency jurisdiction has been terminated, and mother has full custody of her children.  (*In re D.P.* (2023) 14 Cal.5th 266, 277–278.)

Moreover, there is no need for us to exercise our discretion to review her challenge.  As noted by DCFS, mother did not challenge the allegations against father.  (*In re D.P.*, *supra*, 14 Cal.5th at p. 283.)  And the unchallenged findings against father were more serious than those leveled against mother.  (*Id.* at p. 286.)  Furthermore, the jurisdictional findings regarding mother were not "based on particularly pernicious or stigmatizing conduct."  (*Id.* at pp. 285–286.)  Keeping in mind "the overarching goals of the dependency system" (*id.* at p. 286), we decline to exercise our discretion here.

This conclusion does not resolve mother's appeal concerning Jaxson as jurisdiction has not been terminated in his case.[10]  Thus, we turn to the merits of her appeal concerning him.  In so doing, we note that our discussion *infra* applies equally to mother's argument concerning the six younger children.

---

[10]  We decline DCFS's request to dismiss mother's appeal as nonjusticiable because there has been no challenge to the sustained allegations against father.  The juvenile court's jurisdictional findings are what make mother an offending rather than a nonoffending parent.  (See *In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763, disapproved on other grounds in *In re D.P.*, *supra*, 14 Cal.5th at p. 283.)  Under these circumstances, and "[b]ecause dismissal of an appeal for mootness operates as an affirmance of the underlying judgment or order," we opt to address the merits of mother's appeal in reaching the same result.  (*In re D.P.*, *supra*, at p. 285.)  We also deem mother's argument at the disposition hearing sufficient to preserve this argument on appeal.

II. *Jurisdiction*

    A. <u>Standard of review</u>

As the parties agree, we review the juvenile court's jurisdictional findings for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574, overruled in part by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)  Substantial evidence is evidence that is reasonable in nature, credible, and of solid value. (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 446, overruled in part by *Conservatorship of O.B.*, *supra*, at p. 1010, fn. 7; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)  "[W]e view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders."  (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)  "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.  [Citation.]"  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

As the appellant, mother must establish that the challenged rulings are not supported by substantial evidence. (See *In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

    B. <u>Applicable law</u>

Section 300, subdivision (b)(1)(A), authorizes dependency jurisdiction over a child where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶]  [t]he failure or inability of [his or her] parent . . . to adequately supervise or protect the child."  Three elements are often cited as necessary for a jurisdictional finding under section 300, subdivision (b)(1): "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the

minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)  "The third element . . . effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).  [Citations.]" (*In re Savannah M.*, *supra*, 131 Cal.App.4th at p. 1396.)

The court "'need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  "'The purpose of dependency proceedings is to prevent risk, not ignore it.'" (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

"[T]he court may . . . consider past events when determining whether a child presently needs the juvenile court's protection.  [Citations.]  A parent's past conduct is a good predictor of future behavior.  [Citation.]  'Facts supporting allegations that a child is one described by section 300 are cumulative.'  [Citation.]  Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' [Citation.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

Section 300, subdivision (j), authorizes dependency jurisdiction over a child whose "sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions.  The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent

14

or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

C. <u>Analysis</u>

Applying these legal principles, substantial evidence supports the findings that mother medically neglected Zoe and Mia, and failed to protect the children against father's domestic violence, verbal abuse, marijuana abuse, and marijuana cultivation.

1. *Domestic violence*

Mother separated from father in April 2020, and left the home shortly thereafter. She left because of father's violent and abusive behavior. In fact, she stated that it was no longer safe for her to be in the home because father was "'verbally abusive.'" There was also evidence that the children had witnessed the domestic violence.

Despite mother's full awareness of father's violent tendencies and capacity for verbal abuse, she left the children in his custody. And, when she did so, she was admittedly (and rightly) concerned about the children. She knew that father was screaming and demeaning the children because she heard him while on the phone with the children. And she had seen the video from Kayla, in which Linus and Mia indicated that father had threatened to physically harm them.

Mother knew about her children's emotional issues, including anxiety and self-harming, results of father's mistreatment of them. Still, she failed to protect them by leaving them with father.

Prior to mother fleeing the home, mother claimed she attempted to find a domestic violence shelter to take all of the children, but she was unable to do so. Mother also claimed that

15

she had asked DCFS to remove the children from father's home during one of the August 2020 referrals. However, mother did not make any other efforts to remove the children from the home, and mother did not claim she renewed these efforts even after the situation in the home continued to worsen. By the time of the detention hearing in July 2021, mother was still unable to care for the children.

Taken together, this evidence sufficiently supports the juvenile court's finding that mother failed to protect her children from father's domestic violence and abuse, placing the children at substantial risk of serious physical harm.

2. *Medical neglect*

Meanwhile, the children languished in father's care as he directed his screaming, demeaning remarks, and threats to them. Mia and Zoe's mental health deteriorated, placing them at a serious risk of physical harm. In February 2021 Zoe attempted to take her own life as a result of father's behavior. Mia was also at a serious risk of physical harm as she started losing weight, snuck knives into her room, and contemplated hurting herself due to father's behavior.

Mother was well aware of Zoe and Mia's mental health issues and the resulting serious risk to their physical health. Despite this knowledge, mother medically neglected them and their need for mental health services.

3. *Marijuana*

As mother knew, father frequently used marijuana in the home and cultivated marijuana on the premises. Mother knew or reasonably should have known that father's daily marijuana abuse would impact his ability to safely raise seven children, some with special needs and of tender years, and mother failed to

protect the children from this risk.  "Exercise of dependency jurisdiction under section 300, subdivision (b), is proper when a child is 'of such tender years that the absence of adequate supervision and care poses an inherent risk to [his or her] physical health and safety.'  [Citation.]"  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.)

Similarly, mother was aware that there was abundant marijuana in the home and knew or should have known that it created a detrimental condition for the children.  In fact, father had given Zoe a marijuana edible and Jaxson had used marijuana.  Further, Harrison and Xander had interacted with the marijuana plants and had gotten into the fertilizer, further evidence of mother's failure to protect.  (See *In re Cole Y.* (2015) 233 Cal.App.4th 1444, 1453–1454.)

4. *These risks were not speculative*

Urging us to reverse, mother argues that the risk from her action (or inaction) was "speculation" rather than real.  However, the juvenile court heard mother's arguments about her helplessness, and substantial evidence supports the juvenile court's rejection of that argument.  The juvenile court noted that mother fled the home for her own safety, but did not consider the safety of the children.  Rather, mother "started a new relationship with a new boyfriend[, which interfered] with her ability to take her other children into her home."

The juvenile court's finding is supported by mother's history of domestic violence with father that drove her from the home, her contact with the children where she could overhear father verbally abusing the children, her awareness of Zoe and Mia's untreated mental health needs, and her awareness of father's marijuana abuse and cultivation while trying to care for

17

seven children—several of which have special needs and are very young.

As set forth above, "'[t]he purpose of dependency proceedings is to prevent risk, not ignore it.' [Citation.]" (*Jonathan L. v. Superior Court*, *supra*, 165 Cal.App.4th at p. 1104.)  Thus, there was no reason for the juvenile court "to hold its protective power in abeyance until harm to [the children was] not only threatened but actual." (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1004.)

## DISPOSITION

Mother's appeal concerning Zoe, Mia, Linus, Willow, Harrison, and Xander is dismissed.  The juvenile court's jurisdictional findings and dispositional order concerning Jaxson are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:



_____, P. J.
LUI



_____, J.
CHAVEZ


18